590 A.2d 1364

**Oscar PETTIGREW, Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (YARWAY COMPANY), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 8, 1991.

Decided May 6, 1991.

490

Lawrence D. Levin, Elkins Park, for petitioner.

Stephen J. Harlen, Swartz, Campbell & Detweiler, Philadelphia, for respondent.

Before DOYLE and BYER, JJ., and BARRY, Senior Judge.

## OPINION

BARRY, Senior Judge.

Oscar Pettigrew, the claimant, appeals an order of the Workmen's Compensation Appeal Board (Board) which affirmed a decision of a referee granting a modification petition of Yarway Company, the employer. We reverse.

While working for the employer in 1984, the claimant was injured in a fall. He began collecting benefits for total disability pursuant to a notice of compensation payable. He returned to work for only one day but was unable to do his job. The claimant and the employer signed a supplemental agreement by which the employer agreed to continue to pay total disability benefits.

In June of 1987, the employer filed a suspension petition, treated as a modification petition, wherein the employer alleged that the claimant was able to return to work with no loss of earnings. The claimant filed a timely answer, alleg-

ing that he was still totally disabled. The employer requested a supersedeas; the referee granted a partial supersedeas, reducing claimant's weekly benefits from $320.00 to $243.55. Following hearings, the referee found that the claimant was capable of performing light duty jobs, that the claimant was made aware of some jobs that were available and that the claimant did not apply for any of those jobs. The referee concluded that the claimant's weekly benefits should be reduced to $213.94 based upon a weekly earning power of $178.40. The Board affirmed and this appeal followed.

Our scope of review is limited to determining whether any party's constitutional rights were violated, whether an error of law was committed or whether all necessary factual findings are supported by substantial evidence. 2 Pa.C.S. 704. Furthermore, whenever expert medical testimony is required for any necessary factual finding, that testimony must be unequivocal to be classified as substantial evidence. *Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board (Lucas)*, 77 Pa.Commonwealth Ct. 202, 465 A.2d 132 (1983). The employer, having sought to modify the voluntary agreement to pay compensation, bore the proving that modification was warranted. *Seilhamer v. Workmen's Compensation Appeal Board (Berwind Railway Service Co.)*, 122 Pa.Commonwealth Ct. 410, 552 A.2d 336 (1988). Where, as here, the employer seeks modification because the claimant is capable of doing light duty work, the employer is required to produce, inter alia, expert medical testimony that the claimant's condition has changed, thereby rendering him capable of performing work less strenuous than the pre-injury job. *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 516 Pa. 240, 532 A.2d 374 (1987); *Lukens, Inc. v. Workmen's Compensation Appeal Board (Williams)*, 130 Pa.Commonwealth Ct. 479, 568 A.2d 981 (1989).

The claimant argues that the employer failed to meet its burden of proving that the grant of the modification peti-

tion was warranted. Specifically, he argues that the employer failed to offer unequivocal medical evidence on the question of whether he could perform the light duty jobs for which he failed to apply. We agree.

The employer presented the expert medical testimony of Dr. Evelyn Wiener, a board certified specialist in internal medicine, who twice examined the claimant at the employer's behest. Dr. Wiener testified that she first examined the claimant in 1985 and concluded then that "it was premature to make any recommendations regarding his ability to return to any form of employment." (Deposition of Dr. Evelyn Wiener, 2/24/88, p. 12.) The second examination occurred in 1987. Dr. Wiener then concluded that the claimant was not capable of returning to his pre-injury job. She did opine that the claimant was capable of performing light duty, sedentary type jobs.

Dr. Wiener testified that, at the time of the second examination, the claimant's treatment for his work related injury consisted of wearing a back brace, using a cane and taking both a muscle relaxant and Percocet.[1] (Id. at p. 13). On cross examination, the following exchange then occurred:

Q. Now, he also told you he was taking six Percocet per day?

A. Correct.

Q. And a muscle relaxant three times a day?

A. Correct.

Q. And did he tell you what strength Percocet he was taking?

A. Percocet only comes in one strength.

Q. How many milligrams was it; do you remember?

A. It's a combination medication. It's Oxycodone, if I recall correctly, in combination with Tylenol, and the exact amount I can't recall.

Q. What about the muscle relaxants?

---

1. The claimant's medical expert, his treating physician, testified that Percocet was a potent and sometimes addicting narcotic. (Deposition of Dr. Robert Byrne, 11/23/88, p. 10).

A. The muscle relaxant—I don't believe that—he was not able to tell me the name of the pill so it's impossible for me to determine that.

Q. That kept him pretty well doped up the whole day, didn't it?

A. People can—

MR. HARLEN: Objection to the use of the word "doped up".

THE WITNESS: I think that you—

MR. LEVIN: Isn't that what he told you?

THE WITNESS: Wait a minute. Okay. You want to give me a chance to answer the question.

BY MR. LEVIN:

A. I'll withdraw the question and ask you this: Didn't he tell you that that kind of medication kept him pretty well doped up during the day?

A. I have no recollection of him telling me that.

Q. *So you think that someone taking this kind of medication could perform in the workplace?*

A. *It depends. Now, the first thing that you're going to have to do is give me a chance to answer the question. People become habituated to the effects of medication. So what one person may become incapacitated from, another person, if they've been using that medication for a prolonged time may not have the same degree of difficulty functioning.*

The other question—the other and the more important answer to your question is that it was my suggestion and Dr. Wysneski's suggestion that every attempt be made to wean Mr. Pettigrew from the use of that medication because of this habituating effects and because of its effect on the central nervous system.

Q. What about on his ability to work?

A. I don't think I understand what you're asking.

Q. Well, did it have an effect on his ability to work?

A. That is a question that has so much—there are so many different ways—different areas to—factors to answer that.

Q. Well, Doctor, do you—

A. *As I said, some people might be able to work with that; some people would not.*

Q. We're talking about—

A. I would not put him in a situation in which he would then have life or death decisions. I wouldn't put him in charge of an AMTRAK crossing signal if he were on that degree of medication.

Q. *But he could be a security guard?*

A. *It's potential that he could be a security guard. It's also—*

Q. *Or an alarm dispatcher?*

A. *Yes.*

Q. Well doesn't—

A. *Again, this is with the proviso that he be able to come off of the medication.* When I filled out the capacities, what I indicated was on the physical ability of his back, you know, what he was able to perform from a physical basis, the physical limitations that were imposed upon him as a result of the back injury, not as a result of the use of the medication that he was taking. *And the only way I can answer this is with the stipulation that it was a recommendation that his use of that medication be diminished.*

Q. Well, Doctor, as I understand that, the carrier is presenting your testimony and your approval of these jobs on the basis that—they're representing that you're saying that as of March 13th, 1987 or whatever date. Actually it's June 25th, 1987, in some cases—I think that's the date. June, July of 1987, that Mr. Pettigrew could actually do this kind of work?

A. That was my—

Q. There's no limitation whatsoever?

MR. HARLEN: Objection. The Doctor did say the man has limitation. I'm not sure what you mean.

BY MR. LEVIN:

Q. Well, I'm asking you, is that your testimony? Is that what you mean?

A. It was my opinion on that date that he could physically perform those jobs.

Q. Even though he was still on this medication?

A. *With the understanding that it had—that it was a theme of mine that his use of that medication be discontinued.*

Q. *Okay. So if he was still on the medication as of June or July and had not undergone any therapy, then you don't think he could have done these jobs?*

A. *I'm not going to venture an opinion one way or the other on that. I don't know.*

Q. *Well, could he have—*

A. *I don't know. I'm not going to venture an opinion.*

Q. *So you didn't know whether or not on July 15th, 1987 when you said he could do the job of an assembler, if he was still on Percocet or not?*

A. *No. This was based strictly on my evaluation of March 1987.*

(Id. at 28–33.) (Emphasis added.)

In *Philadelphia College of Osteopathic Medicine,* this Court stated:

The phrase 'unequivocal medical testimony' is a shorthand term lawyers and courts have devised and used for the rule of the common law, brought over to the field of workmen's compensation, to the effect that one contending that a condition of disability is the result of injury arising in the course of employment, must, unless the disability is clearly the result of a work injury, produce the expert medical testimony that the claimant's condition in the expert's professional opinion did come from the work experience. . . . It is not sufficient for the medical

witness to testify that the claimant's condition might have been or probably was the result of the claimant's work. However, it is not absolutely essential that the expert say 'that it is my professional opinion' and it is sufficient for the expert to say 'I think' or 'I believe' as the assertion of his opinion....

Unfortunately, the phrase 'unequivocal medical testimony' may seem to import, and certainly is sometimes suggested by counsel in the heat of argument to require, a stricter and more widely applied test of medical opinion testimony than do the rules laid down in the cases just cited, to which the phrase was intended only to give a name. Certainly it is not the law, as it has been sometimes argued, that every utterance which escapes the lips of a medical witness on a medical subject, must be certain, positive, and without reservation, exception, or peradventure of a doubt. We repeat, that as to facts which a claimant must prove by medical evidence, it is sufficient that his medical expert, after providing a foundation, testify that in his professional opinion or that he believes or that he thinks the facts exist. The claimant has, in such event, produced competent evidence of facts which, if accepted by the factfinder will support an award, even if the medical witness admits to uncertainty, reservation, doubt or lack of information with respect to medical and scientific details; so long as the witness does not recant the opinion or belief first expressed.

*Id.*, 77 Pa.Commonwealth Ct. at 205–07, 465 A.2d at 134–35 (citations omitted). In *Bethlehem Steel Corp. v. Workmen's Compensation Appeal Board*, 66 Pa.Commonwealth Ct. 579, 445 A.2d 843 (1982), we held that the question of equivocality was one of law. After reviewing Dr. Wiener's testimony in its entirety, we are convinced that her testimony was equivocal on the question of whether the claimant was capable of doing light duty jobs.[2]

**2.** Our research has found no cases which apply the standard of unequivocal medical testimony to employers attempting to meet its burden of proof under *Kachinski*. As medical testimony is necessary in certain aspects of the employer's burden, we believe the concept of

■ In *Kachinski*, the Supreme Court held that, where an employer is seeking to have benefits modified because the claimant can do light duty work even with the injury, the employer must prove that the job is "actually available". As that court explained:

The court explained what it meant by actually available in the following statement:

[A] position may be found to be actually available, or within the claimant's reach, only if it can be performed by the claimant, having regard to his physical restrictions and limitations, his age, his intellectual capacity, his education, his previous work experience, and other relevant considerations, such as his place of residence. *Kachinski v. Workmen's Compensation Appeal Board*, 91 Pa. Cmwlth.Ct. 543, 546, 498 A.2d 36, 38–39 (1985). This definition is consistent with prior statements by this Court. See *Unora v. Glen Alden Coal Co.*, 377 Pa. [7,] 13, 104 A.2d [104,] 107. However, in applying this definition to the facts of this case the court went beyond its terms and basically imposed on the employer the duty to specify every aspect of every job in question: a cumbersome burden which seems unreasonable in light of the fact that only so much can be known about a job in advance. *It is enough that the employer produce medical evidence describing claimant's capabilities*, and vocational evidence classifying the job, e.g., whether it is light work, sedentary work, etc., along with a basic description of the job in question.... See generally Dissenting Opinion, Doyle, J. Kachinski, 91 Pa.Cmwlth. [543,] 550, 498 A.2d [36,] 40. Thereafter, the decision of the referee will be reviewable as a finding of fact.

*Kachinski*, 516 Pa. at 251, 532 A.2d at 379 (emphasis added).

The employer was required to produce medical evidence describing the claimant's capabilities; it offered Dr. Wiener's testimony. Nowhere in that testimony, however, is

unequivocal testimony applies wherever expert medical testimony is required.

there any definite opinion that this claimant is capable of doing any jobs while taking Percocet at his levels. Dr. Wiener testified that the claimant could do the jobs in question as long as he could wean himself of the narcotics. In fact, Dr. Wiener refused to offer any opinion as to whether the claimant was capable of doing these jobs at the time they were made known to him three to four months after her examination. Under these circumstances, we cannot say that Dr. Wiener's testimony met the required level of certainty to be classified as unequivocal.

■ The employer argues that the claimant failed to present any evidence establishing (1) that the claimant was dependent upon the Percocet and (2) that the Percocet would adversely affect his ability to do the light duty jobs. We need only note that a claimant bears no burden of proving anything when an employer files a modification petition. The employer bears the burden of proving that the modification petition should be granted. In this case, it was required to offer unequivocal medical evidence that the claimant was capable of performing these jobs. As the employer failed to present such evidence, it failed to meet its burden and the order of the Board, affirming the referee's decision to grant the modification petition, must be reversed.

## ORDER

NOW, May 6, 1991, the order of the Workmen's Compensation Appeal Board, dated September 6, 1990, at A 89-1011, is reversed.